UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

T-MOBILE NORTHEAST LLC and T-MOBILE
LICENSE LLC,

                          Plaintiffs,

               - against -

THE TOWN OF RAMAPO, THE TOWN OF
RAMAPO PLANNING BOARD, PLANNING
BOARD CHAIRMAN SYLVAIN KLEIN,
BRACHA GOBIOFF, BRENDEL LOGAN, REV.
WALTER BRIGHTMAN, JR., JOHN BRUNSON,
RICHARD STONE, DORA GREENE, in their
official capacities, constituting the Town Planning
Board, THE TOWN OF RAMAPO TOWN BOARD
and LIBORIO DERARIO in his official capacity as
Director of Building Administration and Code
Enforcement,

                        Defendants.

08 Civ. 2419

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

        In this action, certain subsidiaries of T-Mobile USA, Inc., allege that the Town of

Ramapo and related officials and entities violated various provisions of the federal

Telecommunications Act ("the TCA"), 47 U.S.C. § 151 *et seq.*, and New York state law

when, after a twenty-two month application process, the Town rejected their application

to construct a wireless communications tower on Town property.  The plaintiffs seek

summary judgment on all of their claims and an injunction compelling the Town to

approve their application.  For the reasons explained below, the plaintiffs' motion for

summary judgment is granted, and the defendants are ordered to grant the special permit

and site plan approval necessary to enable plaintiffs to build their tower.

## I.      BACKGROUND

The following facts are not in dispute.  Nearly all are derived from the administrative record ("the Record") in this case, and the remainder have not been challenged by either party.

### A.      The Parties

T-Mobile Northeast LLC and T-Mobile License LLC[1] (collectively, "T-Mobile") are in the business of providing wireless telecommunications services.  (Gaudioso Aff. ¶ 14.)  That business requires T-Mobile to create and maintain a network of cell sites, each consisting of antennas and related equipment designed to send and receive radio signals.  (R. at 00066.)  The FCC has licensed T-Mobile to provide wireless communications services throughout New York, including in Ramapo.  (Gaudioso Aff. ¶ 14; R. at 00132.)

The defendants are Ramapo, an unincorporated town in New York, as well as Ramapo's Town Board, its Planning Board and that Board's members, and the Town's Director of Building Administration and Code Enforcement (collectively, "the Town").  Ramapo's Town Board is its governing body.  (*See* Defs.' Failure to Deny ¶¶ 18–19 of 1st Am. Compl. in Answer.)  The Town Board has delegated to the Planning Board the authority, *inter alia*, to grant special permits and site plan approvals for the construction and installation of telecommunications facilities like those T-Mobile has proposed here.  (*See* Defs.' Failure to Deny ¶¶ 18–19 of 1st Am. Compl. in Answer.)  Ramapo's Director

---

[1] Throughout the litigation, the named Plaintiffs have been Omnipoint Communications, Inc.; Omnipoint NY MTA License, LLC; and T-Mobile License LLC.  Recently, the first two Plaintiffs have been merged into the last.  (*See* Stipulation and Order Substituting Parties and Amending Caption, Aug. 3, 2009.)  As a result, the parties stipulated that T-Mobile Northeast LLC and T-Mobile License LLC be substituted as plaintiffs in place of the Omnipoint parties.  (*Id.*)  For convenience, and because the Omnipoint plaintiffs were themselves wholly owned subsidiaries of T-Mobile (*see* 1st Am. Compl. ¶¶ 11–14), the Court refers to the plaintiffs simply as "T-Mobile."

of Building Administration and Code Enforcement bears responsibility for issuing building permits.  (*See* Defs.' Failure to Deny ¶¶ 18–19 of 1st Am. Compl. in Answer.)

**B.      Ramapo's Regulation of Wireless Services**

Since well before this litigation began, Ramapo has regulated the approval of wireless communication services facilities located within its borders.  (R. at 00002.) Those regulations are contained in the Town's Zoning Law.  (*Id.*)  The content of the regulations has not changed during the period of this litigation.  (Pltfs.' R. 56.1 Stmt. ¶ 3.)

Ramapo's zoning regulations prescribe specific height limitations and setback requirements for wireless communications facilities.  (R. at 00678–00683.)  An applicant may ask the Zoning Board of Appeals to grant it a variance for the height limitation and setback requirements.  (Defs.' Opp. 5–6.)  Each applicant must also submit an application for a special permit and site plan approval from the Planning Board.  (R. at 00682.)

On or about March 30, 2005, the Town Board chose to enact, and later to extend, a law imposing a moratorium on wireless facilities in the Town.  (*Id.* at 00001–00006, 00010–00011.)  The moratorium's stated purpose was to allow for the Town's consideration of "additional provisions regarding siting of facilities."  (*Id.* at 00002.)  The moratorium precluded any final approval of a special permit or building permit for a wireless communications services facility (*Id.*), and it remained in effect for a total of nine months.  (Pltfs.' R. 56.1 Stmt. ¶ 1.)  To date, the Town has proposed no changes to its Zoning Law.  (*Id.* ¶ 3.)

**C.      The Town's Review of T-Mobile's Application**

When a gap in a provider's wireless communications coverage exists in an area, the provider's customers in that area experience inadequate service, including the inability to place or receive calls and the problem of interrupted or disconnected calls. (R. at 00066.)  A gap in T-Mobile's coverage exists in Ramapo.  (*Id.* at 00065–00076, 00213–00226, 000347–00358; Pltfs.' R. 56.1 Stmt. ¶ 28.)  The plaintiffs' proposed facility would remedy that gap in coverage.  (*Id.*)

Since at least 2005, T-Mobile has sought to build a new wireless communications facility in Ramapo to address its coverage gap.  (R. at 00007–00009.)  In October of 2005, while the moratorium was still in place, T-Mobile asked the Board for a waiver to allow it to apply for approval to locate a wireless communications services facility at a public utility gas substation owned by Orange and Rockland Utilities ("O & R").  (*Id.*)  The Board denied that request.  (*Id.* at 00034.)

After the moratorium expired, on April 17, 2006, T-Mobile filed an application to the Planning Board for special permit and site plan approval to install a wireless facility at the O & R site.  (Pltfs.' R. 56.1 Stmt. ¶ 4; R. at 00035–00146a.)  The application included all required forms, a narrative summary in support of the application, an environmental assessment form, and a site plan.  (R. at 00035–00146a.)  The narrative summary contained a "technical demonstration that the Facility was necessary to remedy a significant gap in service."  (Pltfs.' R. 56.1 Stmt. ¶ 6; *see* R. at 00065–00094.)

As originally formulated, the application proposed front yard, rear yard, and side yard setbacks—of 176.3, 178, and 104 feet, respectively—smaller than the minimum 200-foot setbacks the Zoning Law required.  (Defs.' Opp. 5.)  It also proposed a 120-foot

tower, which exceeded the Zoning Law's 100-foot height limitation.  (*Id.*)  These issues
required T-Mobile to apply to the Town's Zoning Board of Appeals for variances.  (*Id.*
5–6.)  During the course of the zoning appeals process, T-Mobile agreed to reduce the
height of the proposed facility to 100 feet in order to comply with the Zoning Law's
height limitation.  (R. at 00331–00335, 00337, 00358a.)  The Zoning Board eventually
granted the other variances in April of 2007.  (*Id.* at 00331–00335.)

      The Planning Board initially met to discuss T-Mobile's application on July 11,
2006.  (*Id.* at 00229–00231.)  At that time, it asked the applicant to "submit a list of
alternate sites that were investigated for placement of the tower."  (*Id.* at 00229.)  At the
meeting, Raj Makhija, a radio frequency engineer for T-Mobile, explained to the Board
how the site was selected.  (*Id.* at 00231.)  Mr. Makhija, in response to questioning,
described the location of the coverage gap.  (*Id.*)  Several town residents voiced concerns
about how the tower would look and about the risks it could lower property values in the
surrounding area or create health hazards.  (*Id.*)  The Town's attorney, Alan Berman,
explained that the TCA precluded the Board from considering the facility's possible
impacts on health.  (*Id.* at 00230.)  The Board adjourned the matter to a September 12,
2006 meeting.  (*Id.* at 00231.)

      Following the July 11 meeting, T-Mobile submitted supplemental materials to the
Planning Board in response to questions raised at the meeting.  (*Id.* at 00234–00252.)
The materials included a chart itemizing alternate sites that T-Mobile had considered and
detailing their physical characteristics, square footage, property use, zoning use, and the
reasons for their rejection.  (*Id.* at 00241.)  In response to a Planning Board member's
request for T-Mobile to consider using a tree-pole facility similar to one already in place

in Ramapo, T-Mobile agreed to use a tree-pole designed by the same manufacturer.  (*Id.* at 00236.)

At the continued public hearing on September 12, 2006, the Planning Board asked which of the alternate sites T-Mobile had visited.  (*Id.* at 00254.)  T-Mobile's counsel, Ms. Cara Bonomolo, named three sites.  (*Id.*)  She explained that each of those sites would require the construction of a new tower, and that they were located too far to the west to provide coverage to close T-Mobile's coverage gap in the area.  (*Id.*)  Ms. Bonomolo also explained that an existing tower located east of the proposed site would not be a feasible location, because the grade elevation there was too low to provide adequate coverage.  (*Id.*)  Another T-Mobile representative reviewed August 15, 2006 reports that calculated radio frequency omissions levels for the proposed facility; those reports determined that the site would easily be in compliance with FCC omissions standards.  (*Id.* at 00255.)  Still, various town residents voiced concerns that the tower would create health hazards and could spur a decline in the area's property values.  (*Id.* at 00256.)  The Planning Board adjourned the matter to October 17, 2006, so that the applicant could review the possibility of locating on other alternate sites with existing towers—specifically, the Summit Park Tank tower and existing towers already located on the O & R site—as well as the possibility of using alternate technologies, like cell towers on wheels ("COW").  (*Id.*)

Following the September 12 meeting, T-Mobile submitted supplemental materials for the Planning Board to review, including an affidavit by Mr. Makhija.  (*Id.* at 00258, 00274–00305.)  Mr. Makhija's affidavit described the unfeasibility of Summit Park Tank's tower, which Mr. Makhija said was too far to the north, and the O & R towers,

which he said were not tall enough.  (*Id.*)  The submission also contained coverage maps simulating the coverage that various extensions to the existing O & R utility tower would provide.  (*Id.*)  Finally, the submission contained a review of cell towers on wheels ("COW"), concluding that it was not a feasible alternative because COW would not remedy the coverage gap—the proposed tower would need to be built in any case—and because COW requires the use of a generator, creating additional and unnecessary noise.  (*Id.* at 00258, 00277.)

On October 13, 2006, the Town's planning consultant, John Lange, submitted a letter to the town's planning attorney that summarized T-Mobile's progress.  (*Id.* at 00309–00310.)  That letter stated that

> the applicant addressed six possible alternatives . . . . Cell coverage maps were provided for each alternative[,] including coverage for each additional 10[-]foot increment to the [existing] O&R Tower locations.  With the exception of the O&R sites, none of these sites provides adequate coverage to service the known gaps.  With the [existing] O&R locations, the O&R Towers['] height would have to be increased dramatically to provide the coverage. . . . O&R has signed an exhibit stating that the height of these Towers could not be increased to the extent required, eliminating these as alternatives.

(*Id.*)  Mr. Lange concluded that, "[w]ithin the limited review parameters available to the Planning Board, the applicant has provided sufficient information on alternative locations to support [its] contention that the proposed site is one that meets [its] coverage requirements with the least impact upon the environment."  (*Id.* at 00310.)

At the continued public hearing on October 17, 2006, the Planning Board adopted a negative declaration pursuant to New York's State Environmental Quality Review Act ("SEQRA")[2] which found that T-Mobile's proposal would "not have a significant

---

[2] SEQRA is a state environmental review procedure that requires state and local agencies to perform an environmental impact assessment before issuing a discretionary permit.  *See* N.Y. Comp. Codes R. & Regs.

adverse impact on the environment and . . . no environmental impact statement need be prepared." (*Id.* at 00311.)  Among the Board's reasons for issuing the negative declaration were that

> [t]he applicant has selected a site that is a current utility site which is well screened from the surrounding neighborhood.  The visual analysis shows that the location will be minimally noticed during the leaf on[-]seasons. . . . The evergreen antenna will help mitigate visual impacts for leaf off[-]times.  The antenna has been placed as close as possible to the middle of the site to again mitigate impacts. . . . No residences will be closer than 200 feet of the tower.  The applicant has provided alternative site evaluation and co-location information on known and planning board[-]suggested sites.  This site provides the best option for closing the coverage gap.  No other location could provide the coverage required with the exception of the existing O&R towers number 1 and 4, but each would have required altering the towers to increase their height to one hundred seventy five feet, one hundred feet higher than their current level, an impractical solution.

(*Id.*)

At the October 17 meeting, Ms. Bonomolo described T-Mobile's review of alternative sites and its reasons for finding that each of those sites was unfeasible.  (*Id.* at 00314.)  A Board member asked Mr. Lange if he thought that T-Mobile had "exhausted all research to find an alternative site for a cell tower."  (*Id.*)  Mr. Lange responded that "T-Mobile had done intense research" and "this proposed site would be the most adequate."  (*Id.*)  Mr. Lange added that because "there are no existing structures in the vicinity of this proposed site, . . . new construction is needed by the applicant."  (*Id.* at 00314–00315.)  Mr. Lange said that if other companies need service in that area in the future, they may co-locate on T-Mobile's tower.  (*Id.* at 00315.)  Several town residents voiced opposition to the construction of a tower in their "back yard[s]," and one resident said he "does not use a cell phone" and thus does not need a facility in the area.  (*Id.*)

---

tit. 6, § 617.  A "negative declaration" is an agency's "written determination . . . that the implementation of the action as proposed will not result in any significant adverse environmental impacts."  *Id.* § 617.2(y).

Another resident said that the applicant needed to figure out a way to co-locate on an existing tower; Ms. Bonomolo again explained that T-Mobile had considered a number of alternative sites, and that none would close the coverage gap.  (*Id.*)  Several residents again said they opposed the tower because of "health issues" or "health risks" from the proposed site, although one person acknowledged that "radio frequency levels are well below the Federal Guidelines."  (*Id.*)

On March 9, 2007, T-Mobile asked the Hillcrest Fire Department if it would be interested in leasing Fire Department property to T-Mobile for construction of its facility there.  (*Id.* at 00330.)  The Fire Department rejected that offer.  (*Id.* at 00332.)

As noted, the Zoning Board granted T-Mobile the necessary area variances on April 12, 2007.  (*Id.* at 00331–00335.)  The Zoning Board concluded that "it has been demonstrated that . . . the benefit sought by the Applicant can not be achieved by some method, feasible for the Applicant to pursue, other than an area variance."  (*Id.* at 00334.)  The Zoning Board noted T-Mobile's testimony that the Fire Department had rejected T-Mobile's offer to locate the tower on its property; that the Summit Park Water Tank would not provide feasible coverage; and that T-Mobile "first looked at the existing facilities on the Town's inventory list, and none were a feasible alternative."  (*Id.* at 00332.)

In connection with the Zoning Board review process, T-Mobile asked PierConSolutions, its radio frequency engineer, to review and analyze T-Mobile's radio frequency requirements for the site, its definition of the area of the coverage gap, and alternative locations for the site.  (*Id.* at 00347–00358.)  On April 11, 2007, PierCon submitted its findings to the Zoning Board, together with coverage maps illustrating its

findings.  (*Id.*)  PierCon reviewed field test data and conducted "predictive propagation analysis" for several alternate sites, and it concluded that each alternate site would fail to close the wireless coverage gap.  (*Id.* at 00348–00349.)

On June 27, 2007, the town's planning consultant, Mr. Lange, submitted a memorandum to the town's planning attorney that concluded, "Since the Zoning Board of Appeals has granted the variances required, and since the height of the tower has been reduced to the maximum allowable height and since all of the other concerns have been mitigated, this is ready for final site plan approval."  (*Id.* at 00364.)

In a letter to T-Mobile dated September 10, 2007, the Hillcrest Fire Department, having evidently experienced a change of mind, stated its interest in locating T-Mobile's tower on its property.  (*Id.* at 00367.)  The Town's Community Design Review Committee ("CDRC") then held a meeting on October 10, 2007, to address that prospect. (*Id.* at 00368.)  T-Mobile said at that meeting that it had received no response to its follow-up inquiries to the Fire Department since September 10.  (*Id.* at 00374.)  It also submitted to the CDRC a letter from PierCon that demonstrated the Fire Department property was not a feasible alternative to T-Mobile's proposed site.  (*Id.* at 00371.) Specifically, the property's elevation was such that a tower "in excess of 200 [feet]" would be needed to bridge the existing coverage gap.  (*Id.*)  On November 8, 2007, the Town received a letter from its consultant, RCC Consultants, that reached the same conclusion.  (*Id.* at 00375.)

On November 16, 2007, T-Mobile submitted to the Planning Board an appraiser's comparative sales analysis that concluded that the proposed tower would not result in diminution of property values in the area.  (*Id.* at 00411–00426.)  At the continued public

hearing a few weeks later, on November 27, Ms. Bonomolo requested conditional use and final site development plan approval for T-Mobile. (*Id.* at 00390.) Several town residents again stated their concerns about the adverse effect the tower would have on property values in the area. (*Id.* at 00390–00391.) One resident asked whether an existing T-Mobile site could be used for co-location. (*Id.*) Ms. Bonomolo responded that that alternate site had been reviewed and rejected in the report T-Mobile submitted prior to the May 2007 Planning Board Meeting, on the ground that it did not remedy the wireless coverage gap. (*Id.* at 00391.) Another town resident asked whether T-Mobile could employ a District Antenna System (DAS) as an alternative to its proposed facility. (*Id.*) A T-Mobile radio frequency engineer explained that DAS is typically employed for buildings and tunnels, not in an outside environment, and that it would not provide sufficient coverage. (*Id.*) The engineer reiterated that the area of the coverage gap had been tested, and that the results indicated "very poor signal with a significant gap in coverage." (*Id.* at 00393.) The Board moved to adjourn the hearing to December 11, 2007, to allow the Town to study the feasibility of DAS as an alternative to T-Mobile's proposal. (*Id.* at 00394.)

At the Planning Board's continued public hearing on December 11, 2007, the Board stated its intention to have its consultant undertake an independent study on the feasibility of DAS to remedy the relevant coverage gap, and the Board adjourned the hearing to January 8, 2008, pending the study's completion. (*Id.* at 00432.) The town's consultant initially concluded that DAS was feasible "from a technical and implementation standpoint." (*Id.* at 00455.) T-Mobile subsequently submitted evidence from its radio frequency engineer of DAS's unfeasibility. (*Id.* at 00459–00466.)

11

At the Planning Board's continued public hearing on January 8, 2008, the Board indicated that it needed more time to review both RCC's and PierCon's reports. (*Id.* at 00468–00469.) Ms. Bonomolo again stated that a coverage gap existed and that no alternate proposals, whether construction of new towers or co-location with existing towers, would remedy that gap in a less intrusive way. (*Id.* at 00469.) At the meeting, Mr. Lange, the town's planner agreed, stating that the alternate locations T-Mobile had considered were not feasible because they would fail to close the coverage gap, not because they would be too expensive. (*Id.* at 00495–00496.) Mr. Lange said that other sites contained "geographic impediments" that the proposed site did not. (*Id.* at 00496.) The Board adjourned the meeting to February 12, 2008, for additional time to review the reports on DAS's feasibility. On January 23, 2008, the Town Board received its consultant's revised DAS feasibility study, which decided that T-Mobile's use of DAS in Ramapo was in fact "not feasible from an implementation perspective." (*Id.* at 00578.)

At the Planning Board's continued public hearing on February 18, 2008, Ms. Bonomolo noted the "numerous studies" T-Mobile had submitted over the previous two years that demonstrated a coverage gap in the area surrounding the proposed tower. (*Id.* at 00604.) The Board made a motion to grant T-Mobile a special permit. (*Id.* at 00614.) That motion failed. (*Id.*) A Board member then asked the Town's attorney what would qualify as a legally valid basis for denying the permit:

> [Board member Dora] Greene: Did I understand that if a cell tower is not in agreement with the character of the neighborhood and it discourages use of contingent properties, that that would be a reason?
>
> [Town attorney Alan] Berman: That is a proper basis. Whether a court will uphold that based on the record, that is up to the Court, but it's a basis to deny it if you so wish, . . . and you have to base it on—you can't just make the mere statement that it's going to impact the thing. You have to point to reasons to

support your conclusion, because a Court, when it looks at a decision, will look
not only at the decision, but the record, so the decision has to point to items and
testimony in the record to support it.

Ms. Greene: So items and testimony in the records support it?

Mr. Berman: I can't tell you whether it does. I can only advise you what the law
is. I can't tell you whether it would be a basis or not, that's not my role as the
municipal attorney.

(*Id.* at 00615–00616.)

Subsequently, the Planning Board "reserve[d] decision until the next meeting" on

March 12, 2008, so that the "Board members can think about the record." (*Id.* at 00617.)

Ms. Bonomolo then requested that the public hearing be reopened, and she submitted

another appraisal's finding that T-Mobile's proposed site would not affect property

values in the area. (*Id.*) The Board voted to keep the hearing open till March 11, 2008.

(*Id.* at 00628.)

On March 10, 2008, a town resident submitted to the Planning Board a letter of

opinion from George Pinkham, a real estate appraiser, stating that "any appraisal

prepared by me of a residence located within 500 feet of a cell phone tower would come

to the conclusion that the market value would be lower than a similar property located

outside" that range. (*Id.* at 00643.) At the continued public hearing on March 11, 2008,

the Board voted to close the public hearing and to deny the application, by a vote of 4 to

2. (*Id.* at 00674.) According to the meeting's minutes, contained in the administrative

record, this decision was "based on the detrimental impact, based on the letter dated

March 10, 2008 from Mr. George R. Pinkham, Appraiser," and because "the T-Mobile

Tower would be an eye so[re] and would lower the property value of the surrounding

homes living near the proposed tower." (*Id.*) On May 23, 2008, more than two months

after T-Mobile commenced this suit, the Planning Board filed a formal decision with the Town Clerk's office that purported to articulate the Board's reasons for denying T-Mobile's application.  (*See* Sprecht Aff. ¶¶ 2–5.)  That decision stated that the application was denied because:

    a.  Tower would be an eyesore.
    b.  Town would lower property values of the surrounding homes near the proposed Tower.

(*See* Sprecht Aff., Ex. A.)

       The Court notes an interesting addendum to the facts in this case.  In its Rule 56.1 statement, T-Mobile asserted that "[i]n moving to deny the application, Defendant Planning Board member Brendel Logan stated that the Facility is a 'health risk,' an 'eyesore,' and will 'lower property values.'"  (Pltfs.' R. 56.1 Stmt. ¶ 49.)  The Town's Response disputed the assertion that a Board member had said that the wireless tower posed a health risk.  (Defs.' Response to Pltfs.' R. 56.1 Stmt. ¶ 49.)  The Town was forced to retract its denial, however, after T-Mobile obtained a copy of the audio tape of the March 11, 2008 Planning Board meeting.  (*See* Pltfs.' Reply, Ex. 1.)  Both parties agree that the tape clearly indicates that one of the Planning Board's stated reasons for denying T-Mobile's application was that the facility posed a "health risk."  (*Id.*)

## D.    PROCEDURAL HISTORY

       On March 10, 2008, just prior to the Planning Board's denial of its application, T-Mobile filed the present lawsuit against the Town of Ramapo, the Town's Planning Board and the Planning Board's members in their official capacities, and the Town's Director of Building Administration and Code Enforcement in his official capacity.  In its amended and supplemental complaints, T-Mobile asserted claims under Section 332 of

the TCA as well as under Article 78 of New York's Civil Practice Law and Rules.  It alleged that the Town's refusal to make a decision on its application for twenty-two months amounted to an unreasonable delay under Section 332(c)(7)(b)(ii) of the TCA.  It further alleged that the Town's eventual decision to deny its application was a prohibition on wireless services under Section 332(c)(7)(b)(i)(II); was neither in writing nor based on substantial evidence in violation of Section 332(c)(7)(b)(iii); and was unlawfully grounded in concerns about the proposed facility's "environmental effects" under Section 332(c)(7)(B)(iv).  T-Mobile also alleged that, under New York's Article 78, the Town's decision was arbitrary and capricious and unsupported by substantial evidence.

T-Mobile now moves for summary judgment on all claims and for permanent injunctive relief.  The Town opposes summary judgment on the grounds that its decision was timely, in writing, and supported by substantial evidence.

## II.    DISCUSSION

### A.    Standard

The standard for granting summary judgment is familiar and well established.  A court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This District's Local Rule 56.1 requires a movant to submit "a separate, short and concise statement" setting forth material facts as to which there is no genuine issue to be

tried.  Local R. 56.1(a).  The non-movant must respond with its own statement of facts,

including citations to admissible evidence as to which a triable issue remains.  Local R.

56.1(b) & (d); *see* Fed. R. Civ. P. 56(e) (a "properly made and supported" summary

judgment motion requires the non-movant to "set out specific facts showing a genuine

issue for trial").  The facts set out in a moving party's 56.1 statement "will be deemed

admitted unless controverted" by the opposing party's statement.  Local R. 56.1(c); *see*

*Siddiqi v. New York City Health & Hospitals Corp.*, 572 F. Supp. 2d 353, 358 (S.D.N.Y.

2008).

Local zoning decisions generally receive "extremely deferential" review from

courts, but under the TCA—which invites judicial oversight of siting decisions—courts

review permit denials "more closely" than that.  *Cellular Telephone Co. v. Town of*

*Oyster Bay*, 166 F.3d 490, 493 (2d Cir. 1999).

**B.      The Telecommunications Act of 1996**

T-Mobile alleges that the Town violated four provisions of the TCA.  That Act is

"an omnibus overhaul of the federal regulation of communications companies."  *Sprint*

*Spectrum, L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir. 1999).  It aims "to promote

competition and reduce regulation in order to secure lower prices and higher quality

services for American telecommunications consumers and encourage the rapid

deployment of new telecommunications technologies."  Telecommunications Act of

1996, Pub. L. No. 104-104, Pmbl., 110 Stat. 56.  But the Act is also an exercise in

cooperative federalism, reflecting "a deliberate compromise between two competing

aims—to facilitate nationally the growth of wireless telephone service and to maintain

substantial local control over siting of towers." *Town of Amherst v. Omnipoint Commc'ns, Ents., Inc.*, 173 F.3d 9, 13 (1st Cir. 1999).

To advance these twin goals, Congress enacted Section 332(c) of the Act, which provides for FCC regulation of wireless telephone services.  The Section expressly preempts state and local rate regulation, 47 U.S.C. § 332(c)(3), but it preserves state and local zoning authority over the siting of wireless facilities, *id.* § 332(c)(7)(A).  That zoning authority is subject to five limitations, four of which are at issue here.  *See id.* § 332(c)(7)(B)(i)–(iv).  First, regulation of facilities' siting "shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  *Id.* § 332(c)(7)(B)(i)(II).  Second, state and local governments must act on applications "within a reasonable period of time after the request is duly filed."  *Id.* § 332(c)(7)(B)(ii).  Third, decisions to deny an application must be "in writing and supported by substantial evidence contained in a written record."  *Id.* § 332(c)(7)(B)(iii).  Fourth, regulation of wireless facilities whose radio frequency emissions meet FCC standards must not be based on those emissions' "environmental effects."  *Id.* § 332(c)(7)(B)(iv).

T-Mobile has alleged that in rejecting its attempts to site a new wireless facility in Ramapo, the Town has violated each of these provisions.  As it explains below, the Court finds dispositive T-Mobile's claim under Section 332(c)(7)(B)(i)(II) that Ramapo's denial of a permit has the effect of prohibiting the provision of wireless services in the gap area.  The Court also finds, however, that the Town violated Section 332(c)(7)(B)(iv) in basing its decision partly on health risks from the facility, and that it violated Section

332(c)(7)(B)(iii) in failing to support its decision with substantial evidence.  The Town

violated New York's Article 78 for the same reason.[3]

## C.      Effective Prohibition of Service Claim

The TCA's mandate that zoning regulation shall not "have the effect of

prohibiting the provision of personal wireless services" has spawned considerable

litigation, but its meaning remains to some degree elusive.  The Second Circuit's leading

case on the effective-prohibition provision interprets it to "preclude[] denying an

application for a facility that is the least intrusive means for closing a significant gap in a

remote user's ability to reach a cell site that provides access to land-lines."  *Sprint*

*Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999).  The decision goes on to say

that "once an area is sufficiently serviced by a wireless service provider, the right to deny

applications becomes broader: State and local governments may deny subsequent

applications without thereby violating subsection B(i)(II)."  *Id.*  Under the *Willoth*

standard, a plaintiff will prevail on a Section 332(c)(7)(B)(i)(II) claim if it shows both

that a "significant gap" exists in wireless coverage and that its proposed facility is "the

least intrusive means" to close that gap.  *Id.*

The second prong of the Second Circuit's *Willoth* test is straightforward: if an

applicant's proposal is not the least intrusive means of closing a significant gap in

coverage, a "local government may reject [the] application . . . without thereby

prohibiting personal wireless services . . . ."  *Id.*  As examples, the court in *Willoth*

---

[3] T-Mobile also asserts a TCA claim based on the Town's unreasonable delay in acting on T-Mobile's application.  *See* 47 U.S.C. § 332(c)(7)(B)(ii).  In a similar case, a court in this District found that an applicant's unreasonable-delay claim was mooted by the locality's decision soon thereafter to deny the applicant's permit.  *See Omnipoint Commc'ns, Inc. v. Vill. of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205, 214 n.7 (S.D.N.Y. 2004).  The Court questions whether such a rule might simply reward recalcitrant localities for waiting till litigation has commenced to act on applications they dislike.  In any case, it is unnecessary to reach that claim here, where the Town's violations of other TCA provisions are readily apparent.

suggested that an applicant may be required to "select a less sensitive site," "reduce the tower height," or "use a preexisting structure." *See id.* Where the plaintiff's existing proposal is the only feasible plan to close the relevant coverage gap, it seems evident that no less intrusive means is possible, and the application must be granted.

The first *Willoth* prong is another matter. *Willoth* never said for certain whether a coverage gap "must be measured from the perspective of the individual provider . . . or the perspective of users," and the Second Circuit has since called the question "unsettled."[4] *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 536 n.3 (2d Cir. 2005) (quoting *Omnipoint Commc'ns v. Vill. of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205, 217 (S.D.N.Y. 2004)). Other courts have reached different conclusions about whether *Willoth* established a provider-based or a user-based rule.

The Third Circuit, which has said that it has adopted the *Willoth* test, reads the "significant gap" prong to mean "a gap in the service available to remote users. Not all gaps in a particular provider's service will involve a gap in the service available to remote users." *APT Pittsburgh Ltd. P'ship v. Penn Twp. Butler Cty.*, 196 F.3d 469, 480 (3d Cir. 1999). Some district courts in the Second Circuit have interpreted *Willoth* likewise. *See Omnipoint Commc'ns, Inc. v. Port Authority of New York & New Jersey*, 1999 WL 494120, at *12 (S.D.N.Y. July 13, 1999) (*Willoth* "distinguished regulations that produce gaps in an individual provider's service area from those that result in an absence of coverage by any provider, finding that the latter and not the former prohibit the provision

---

[4] That case did not raise the effective-prohibition claim at issue here. Still, just prior to noting the unsettled nature of the "coverage gap" rule, the Court quoted its *Willoth* holding with the word "user's" in italics. *See White Plains*, 430 F.3d at 536 n.3. That italicized word could be an indication that the Second Circuit believes *Willoth* is a user-based rule. But the minor gesture, dicta contained in a footnote of an opinion addressed to a different legal claim, is too ambiguous in meaning and scope for the Court to place weight on it here.

of wireless services."); *SiteTech Group Ltd. v. Bd. of Zoning Appeals of Town of Brookhaven*, 140 F. Supp. 2d 255, 264 (E.D.N.Y. 2001) (same).

Other courts read *Willoth* differently.  In *Second Generation Props. v. Town of Pelham*, the First Circuit said it understood *Willoth* to "hold that once a carrier has adequate (though less than perfect) service in an area, local boards can deny applications *by that carrier* for additional towers without violating the effective prohibition clause." *Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 632 n.13 (1st Cir. 2002) (emphasis added).  *Second Generation* predicted that the Second Circuit would oppose a rule that "any service equals no gap" in coverage, considering that *Willoth* stressed the idea of adequate, rather than just any, coverage.  *Id.*; *see Willoth*, 176 F.3d at 643 ("Furthermore, once an area is *sufficiently* serviced by a wireless service provider, the right to deny applications becomes broader" (emphasis added)).  A court in this District agreed.  *See Tarrytown Planning Bd.*, 302 F. Supp. 2d at 218 ("*Willoth* only directs a district court to consider whether the denial of an application of a given provider will result in the denial of cell service to users of that provider's service in the given area").

How to judge a significant gap in coverage is a hard question, but the Court believes that the provider-based approach is consistent with *Willoth* and sits more easily with the goals the TCA was designed to advance.  As the First Circuit has persuasively explained,

> A flat "any service equals no effective prohibition" rule would say that a town could refuse permits to build the towers necessary to solve any number of different coverage problems. . . . Such a rule would be highly problematic because it does not further the interests of the individual consumer. . . . [I]t is of little comfort to the customer who uses AT & T Wireless (or Voicestream, Verizon, Sprint, or Nextel) who cannot get service along the significant geographic gap

which may exist along Route 128 that a Cingular Wireless customer does get
some service in that gap.

*Second Generation Props.*, 313 F.3d. at 633.

Under a provider-based standard, T-Mobile has presented overwhelming evidence
that a significant coverage gap exists and that its proposed tower is the least intrusive
means to close that gap.  What is more, defendants have never contested T-Mobile's legal
or factual allegations regarding either claim.  T-Mobile's Rule 56.1 statement
repeatedly—in paragraphs 20, 21, 22, 23, 24, 25, 27, and 28—described "a significant
gap in plaintiff's reliable wireless service."  (Defs.' R. 56.1 Stmt. ¶¶ 20, 21, 22, 23, 24,
25, 27, 28.)  The 56.1 statement also repeatedly—in paragraphs 22–27, 29, 32, and 35–
36—described the unfeasibility of alternate sites for T-Mobile's proposed facility.
(Defs.' R. 56.1 Stmt. ¶¶ 22–27, 29, 32, 35–36.)  The Town's Response to that statement
disputed *none* of those paragraphs and, pursuant to Local Rule 56.1(c), those paragraphs
are deemed admitted.  And the defendants' papers in opposition to T-Mobile's motion for
summary judgment completely ignore its effective-prohibition cause of action.
Defendants' brief offered no factual or legal basis to deny summary judgment on that
claim.

The gaping holes in the Town's opposition to the plaintiffs' motion and in its
response to the plaintiffs' 56.1 statement are likely enough on their own to entitle T-
Mobile to summary judgment.  But this is not merely a pleading deficiency.  The
evidence for T-Mobile on its effective-prohibition claim is just as strong in the
administrative record both parties have stipulated is accurate.

During the application process, T-Mobile presented strong evidence that a
significant wireless coverage gap existed and that its proposal would remedy that gap.  In

an affidavit filed with T-Mobile's initial application, the company's radio frequency engineer explained the methodology he used to locate the areas lacking coverage.  (R. at 00065–00076.)  The affidavit attached coverage maps that identified those areas.  (*Id.* at 00065–00076.)  At the Planning Board's first meeting on the application, the same engineer explained the precise location of the coverage gap.  (*Id.* at 00231.)  T-Mobile later submitted to the Zoning Board of Appeals another radio frequency engineer's report that assessed the area of the coverage gap with supporting coverage maps and descriptions of its methodology.  (*Id.* at 00347–00358.)  During Planning Board hearings in early 2008, T-Mobile's attorney reiterated that technical studies T-Mobile had submitted to the Board during the previous three years had demonstrated the presence of a coverage gap.  (*Id.* at 00469, 00604.)

During that entire period, Town officials never disputed the validity of T-Mobile's assertions or of its evidence.  The Town's own planning consultant even agreed that Ramapo had "known gaps" in wireless coverage.  (*Id.* at 00309–00310.)  The Planning Board's negative declaration pursuant to SEQRA similarly recognized the presence of a "coverage gap" and the need to "clos[e]" it.  (*Id.* at 00311.)

T-Mobile also presented overwhelming evidence that its proposed facility would be the least intrusive means of closing the identified coverage gap.  A radio frequency engineer's affidavit, filed in support of T-Mobile's initial application, detailed why the proposed tower was necessary and other sites were inadequate.  (*Id.* at 00065–00094.)  T-Mobile later submitted to the Planning Board a chart that described alternate sites T-Mobile had considered and that itemized the specific reasons for each site's rejection, such as poor terrain or insufficient grade elevation.  (*Id.* at 00241.)  T-Mobile considered

several such sites on its own initiative, but, when the Planning Board suggested additional alternate sites and technologies, T-Mobile considered each in turn.  It examined the Summit Park Tank tower site but concluded that the site was located too far north to remedy the coverage gap.  (*Id.* at 00256, 00258, 00274–00305.)  It considered extending existing towers at the O & R site but found that only a dramatic extension would remedy the gap.  (*Id.*)  T-Mobile also reviewed two technologies that the Planning Board suggested during the process: cell towers on wheels ("COW") and District Antenna System technology ("DAS").  (*Id.* at 00274–00305, 00394.)  Its conclusions that neither would be feasible alternatives were supported by evidence (*see id.* at 00258, 00277, 00391, 00393) and, in the case of DAS, by a study the Town's own consultant performed (*see id.* at 00459–00466, 00578).

Throughout the application process, T-Mobile accommodated Town officials' and Town residents' suggestions in an attempt to craft a less intrusive but still feasible plan. When asked to consider using a "tree-pole"—which is, as one might guess, a tower designed to look like a tree—T-Mobile agreed, even offering to use the manufacturer who had designed a previous tree-pole in Ramapo.  (*Id.* at 00236.)  T-Mobile also pursued the possibility of using Hillcrest Fire Department property for the tower (*Id.* at 00330, 00332, 00368, 00374), although it—and the Town's consultant—later concluded that the property did not present a feasible alternative (*Id.* at 003371, 00375.)

Town officials consistently agreed with T-Mobile that alternate sites would not be feasible and that T-Mobile's proposal would have, as the Town's consultant, Mr. Lange, put it, "the least impact upon the environment."  (*Id.* at 00310.)  The Planning Board issued a negative declaration pursuant to SEQRA, because, among other things, the

proposed site "is a current utility site which is well screened from the surrounding neighborhood"; "the location will be minimally noticed during the leaf on seasons" and the "evergreen antenna will help mitigate visual impacts for leaf off times"; and the proposal would place the tower "as close as possible to the middle of the site to again mitigate impacts." (*Id.* at 00311.)  The Board concluded that the proposed site "provides the best option for closing the coverage gap." (*Id.*)  At Planning Board hearings on the application in 2006 and 2008, Mr. Lange testified to the Board that "T-Mobile had done intense research" on alternate sites and those sites were not feasible because they contained "geographic impediments." (*Id.* at 00314, 00495–00496.)  Mr. Lange concluded that "this proposed site would be the most adequate." (*Id.* at 00495–00496.)  The Zoning Board of Appeals, in a decision granting T-Mobile the variances its proposal required, found that T-Mobile had proven the variances were necessary because no other method "feasible for the Applicant to pursue" would remedy the coverage gap. (*Id.* at 00334.)  The Zoning Board also noted that of the "existing facilities on the Town's inventory list, . . . none were a feasible alternative." (*Id.* at 00332.)

T-Mobile has made a robust case under both *Willoth* prongs, and the Town has made T-Mobile's case even stronger.  Without any dispute about the presence of a significant coverage gap or the unique feasibility of T-Mobile's plan, no triable issues of material fact remain on T-Mobile's effective-prohibition cause of action.  T-Mobile is entitled to summary judgment on that claim.

**D.    Environmental Effects Claim**

Under the TCA, a state or local government cannot base a decision to regulate a wireless facility on the "environmental effects" of that facility's radio frequency

24

emissions, if the facility is in compliance with FCC standards.  *See* 47 U.S.C. §

332(c)(7)(B)(iv).  Environmental effects within the meaning of the provision include

health concerns about the biological effects of RF radiation.  *Freeman v. Burlington*

*Broadcasters, Inc.*, 204 F.3d 311, 325 (2d Cir. 2000); *Cellular Telephone Co. v. Town of*

*Oyster Bay*, 166 F.3d 490, 494 n.3 (2d Cir. 1999).

There is no dispute between the parties that T-Mobile's proposed facility for the

O & R site complies with the relevant FCC regulations.  And the Town has now admitted

that one of the Planning Board's three stated reasons for denying T-Mobile's application

was that the proposal raised health concerns.  (*See* Pltfs.' Reply, Ex. 1).  Those same

health concerns played a prominent role in community opposition to the application.  In

Planning Board hearings on July 11, September 12, and October 17, 2006, town residents

repeatedly spoke of their concern that T-Mobile's proposed facility would create a health

hazard.  (*See* R. at 00231, 00256, 00315.)  The Court has no trouble concluding that the

Town's decision was at least partly based on the environmental effects of the proposed

tower's radio frequency emissions.

Whether that is enough to violate Section 332(c)(7)(B)(iv) is not clear from the

face of the statute, although an Illinois district court has said, without extended comment,

that it is not.  *See Iowa Wireless Services, L.P. v. City of Moline*, 29 F. Supp. 2d 915, 924

(C.D. Ill. 1998) (finding that the TCA only prohibits denials "on the sole basis" that a

facility would cause negative environmental effects).  The Court believes that the better

and more straightforward reading of the provision—which does not contain a qualifying

word like "solely"—is that any decision actually based on environmental effects is a

violation, whether other legitimate reasons factored into the decision or not. T-Mobile is entitled to summary judgment on this claim.

**E.       Substantial Evidence Claims**

T-Mobile has also asked for summary judgment on its claims under the TCA and state law that the Planning Board's decision was not supported by substantial evidence. *See* 447 U.S.C. § 332(c)(7)(B)(iii); NY. C.P.L.R. § 7803(3) and (4) (McKinney 2006). To determine whether a decision is supported by substantial evidence within the meaning of the TCA, this Court employs the "traditional standard used for judicial review of agency actions." *Oyster Bay*, 166 F.3d at 494 (quoting H.R. Conf. No. 104-458, at 208 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 223). The Court does not engage in its own fact-finding or supplant the Planning Board's reasonable determinations, but it does examine the entire record, "including evidence opposed to the Town's view." *See id.* Substantial evidence means "less than a preponderance, but more than a scintilla of evidence." *Id.*

Article 78 imposes its own requirement that local decisions be supported by substantial evidence. The Article 78 test "is essentially the same as that under the TCA." *Omnipoint Commc'ns, Inc. v. Common Council of City of Peekskill*, 202 F. Supp. 2d 210, 226 (S.D.N.Y. 2002). Substantial evidence is "proof within the whole record of such quality and quantity as to generate conviction in and persuade a fair and detached fact finder that, from that proof as a premise, a conclusion or ultimate fact may be extracted reasonably probatively and logically." *300 Gramatan Ave. Assoc. v. State Div. of Human Rights*, 379 N.E.2d 1183, 1186 (1978).

On the record, fairly read, the Board did not support its decision with substantial evidence.  First, health concerns undoubtedly played a role in both the community opposition T-Mobile faced during the application process as well as the Planning Board's decision in March of 2008 to deny it a permit.  Even though members of the Planning Board had actual notice that those concerns would be an illegitimate ground for denying T-Mobile's permit (*see* R. at 00230), the Board still cited health risks as a ground for its decision.  The Court, of course, cannot say with confidence whether this was the main reason for the Board's denial or not.  Suffice it to say the record reflects that it was a significant reason—and a prohibited reason under the TCA.

The Town asserts that its decision satisfied federal and state procedural standards because it also relied on two legitimate rationales: aesthetic and property value concerns. The Second Circuit has said that both concerns "can be a valid basis for zoning decisions."  *Oyster Bay*, 166 F.3d at 494; *see White Plains*, 430 F.3d at 534–535.  Still, more than a "few generalized expressions of concern" are required.  *Oyster Bay*, 166 F.3d at 496.  In *Oyster Bay*, the court decided that the decision of a town board, which relied on both rationales, failed the substantial evidence test.  The court rejected the board's aesthetics rationale because it was premised on a few residents' comments at public hearings that failed to "articulate specifically how the proposed cell sites would have an adverse aesthetic impact on the community."  *Id.* at 496.  It also rejected the board's property values rationale because the "volume and specificity of the comments were not adequate to satisfy" the test.  *Id.* at 496.  In *White Plains*, by contrast, the court deferred to a town board's reliance on these same two rationales.  But there, the court thought it important that the aesthetic objections made in public hearings were both more pervasive

27

than in *Oyster Bay* as well as "raised by neighbors who know the local terrain and the sightlines of their own homes."  430 F.3d at 534.  In *White Plains*, neighbors made the "eyesore" complaint "throughout" the hearings and the neighbors' expert testified that the cell tower could not be effectively camouflaged in that neighborhood.  *Id.* at 532.  In addition, neighbors of the proposed site obtained other experts who testified on the "anticipated diminution in property values."  *Id.*  Because the court decided that neighbors' aesthetic objections were pervasive enough and informed enough to be legitimate, it did not decide whether the neighbors' expert testimony on property values could on its own constitute substantial evidence.  *Id.* at 534 – 535.

Here, the record reflects a permit application process that more closely resembles *Oyster Bay*'s than *White Plains*'.  The record provides little support for the Planning Board's conclusion that T-Mobile's tower would be an "eyesore."  Several town residents expressed concern about T-Mobile's plan during the application process, but the majority of the comments were either about health risks or grounded in general NIMBY feelings—the October 17, 2006 Planning Board meeting's minutes include the note that one person "does not want a tower in his back yard."  (R. at 00315.)  During the September 12, 2006 meeting, the minutes record several statements about health risks or about general "costs to the community," but no statements invoking aesthetic concerns. (*Id.* at 00253–00257.)  And during the October 17, 2006 meeting, almost all the concerns recorded in the minutes regard health risks.  (*Id.* at 00313–00316.)

Some concerns voiced during the application process—though far from the majority—were aesthetic in nature, but even those were generalized and failed to identify specific aesthetic problems that the tower would create.  According to the minutes of the

July 11, 2006 Planning Board hearing, for example, one person stated his worry that the tower would be an "eyesore"; another asked if T-Mobile could camouflage the tower; and a third said he was concerned about both the "view and radiation." (*Id.* at 00230.)

In defense of its evidence, the Town cites *White Plains*, a case in which the court deferred to the Board's reliance on aesthetic concerns voiced by neighbors of the planned tower. But although the court in *White Plains* did not require a town to produce expert evidence on adverse aesthetic impact, it did care that the constituent comments used as evidence had come from neighbors "who know the local terrain and the sightlines of their own homes." 430 F.3d at 534. By contrast, almost none of the Ramapo residents who commented on the tower's visual impact identified themselves as neighbors whose terrain and sightlines would be directly affected by T-Mobile's proposed tower.

Notably, the Planning Board itself acknowledged, in finding that no environmental impact statement would be necessary under SEQRA, that the site was "well screened from the surrounding neighborhood"; that visual analysis showed that "the location will be minimally noticed during the leaf on seasons"; and that the "evergreen antenna will help mitigate visual impacts for leaf off times." (*Id.* at 00311.) Although this finding may not be dispositive, it certainly undermines the Board's later conclusion that the tower would be an "eyesore." *See C & B Realty Co. v. Town Bd. of Town of Oyster Bay*, 526 N.Y.S.2d 612, 613 (N.Y. App. Div. 1988) (finding that a prior environmental impact ruling that the "project is compatible with its surroundings" undermined the board's subsequent permit denial).

The Board's conclusion that the tower would lower neighboring property values is almost entirely conclusory as well. Several residents during the application process

invoked this concern, but speculatively and without evidence.  One person present at the September 12, 2006 Planning Board meeting asked for "time and opportunity to explore the real estate market[, including] what the [tower's] impact could be on the community." (R. at 00256.)  Another person at that meeting, who claimed to be a real estate agent, asserted, apparently without support, that "a house located near a cell tower is a problem, with respect to market value."  (*Id.*)  The only substantive evidence in the record to support this concern was a "letter of opinion" drafted by George Pinkham, a "certified appraiser," and filed with the Planning Board at the very end of the application process. (*Id.* at 00642.)  That letter asserted that perceived health risks from a cell tower would lower property values for those living nearby.  (*Id.* at 00642–00644.)  But it never actually conducted an appraisal of any properties located in Ramapo, and its information is based on a New Zealand study.  (*Id.* at 00643.)  T-Mobile submitted a comparative sales analysis prepared by an appraiser that concluded the tower would not adversely affect Ramapo property values.  (*Id.* at 00411–00426.)

The Second Circuit in *White Plains* noted that town boards are not required to accept an applicant's expert reports, even if those reports are "insufficiently contested by properly credentialed expert testimony."  *White Plains*, 430 F.3d at 533.  And it did not decide whether a board could legitimately rely on the opinion that perceived health hazards could damage the marketability of property nearby a wireless site.  *Id.* at 534–535.  But in *Oyster Bay*, the court did say that localities should not accord weight to a small number of unspecific, unsupported statements that cell towers adversely affect property values.  *Oyster Bay*, 166 F.3d at 496.  That seems to be precisely what the Ramapo Planning Board did.

30

Viewing the record in its entirety, the Court sees evidence of generalized expressions of concern about aesthetics and property values—along with illegitimate expressions of concern about health hazards—but little more.  The Court concludes that the Planning Board's decision was not supported by substantial evidence under the TCA or state law.

## F.      Remedy

The TCA does not specifically provide a remedy for violations of Section 332(c)(7).  Nor does it say whether the remedy depends on which provision has been violated.  But at least for violations of the substantial evidence provision, 47 U.S.C. § 332(c)(7)(B)(iii), almost all courts to address the question have held that "the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits."  *Oyster Bay*, 166 F.3d at 497 (collecting cases); *see also Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 21–22 (1st Cir. 2002).  Moreover, under *Willoth*, a violation of the effective prohibition provision, 47 U.S.C. § 332(c)(7)(B)(i)(II), requires injunctive relief: an application proposing the "least intrusive means for closing a significant [coverage] gap" cannot be denied—or, put differently, it must be granted.  *Willoth*, 176 F.3d at 643.  The Town does not dispute that T-Mobile's application proposes what *Willoth* requires.  Accordingly, the Town of Ramapo is ordered to grant T-Mobile the permit and site plan approval it needs to locate a wireless communications facility at the O & R site, as it has requested.[5]

---

[5] Although neither party raises the issue, the Court observes that the proper defendant in this case is the Town, not the Town's agencies or boards.  *See, e.g.*, *Omnipoint Commc'ns, Inc. v. Town of Lagrange*, 2009 WL 2878010, at *10 (S.D.N.Y. Aug. 31, 2009) ("In New York, agencies of a municipality are not suable entities."); *Santiago v. City of New York*, 2008 WL 2854261, at *3 (S.D.N.Y. July 21, 2008) (same).  In this case the distinction makes no practical difference.  An injunction that issues against the Town of Ramapo also binds its administrative arms—including its Planning Board and Director of Building Administration and Code Enforcement.

## III.    CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment and their request for injunctive relief **[14]** are granted.  The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
      September 26, 2009

                                          Richard J. Holwell
                                   United States District Judge